[No. 11156-3-III.   Division Three.   March 5, 1992.]

BRENDA SHEIMO, *Individually and as Personal Representative, Plaintiff,* v. ANDREW BENGSTON, *Defendant,* THE CITY OF COLVILLE, *Appellant,* THE COUNTY OF STEVENS, *Respondent.*

*Anne McDonald, Teena M. Killian,* and *Lane Powell Spears Lubersky,* for appellant.

*Richard W. Kuhling, John A. Manix,* and *Paine, Hamblen, Coffin, Brooke & Miller,* for respondent.

SWEENEY, J. — This action follows the tragic death of Thomas Sheimo. Mr. Sheimo was shot by Andrew Bengston as he drove past the Bengston residence during a standoff between police and Mr. Bengston. Brenda Sheimo, Mr. Sheimo's widow, brought this action against Mr. Bengston and the City of Colville (City) alleging the City was negligent in failing to warn and divert passing motorists. The City moved for summary judgment asserting the public duty doctrine as a defense. The court denied the motion. Thereafter, the City and the Sheimo estate settled.

The City filed a third party complaint against Stevens County (County) claiming a right to contribution. The County moved for summary judgment arguing county officers assisting in the Bengston operation were under the direction and control of the City and therefore not liable pursuant to the Washington Mutual Aid Peace Officer Powers Act of 1985, RCW 10.93 (the Act). The City argued the Act did not apply, but if it did, there were unresolved questions of fact. The court granted the County's motion for summary judgment and dismissed the third party complaint. We affirm.

FACTUAL BACKGROUND

At approximately 5 p.m. on June 5, 1987, James Carpenter called the county sheriff's office to report a domestic dispute between his neighbors, Patricia and Andrew Bengston. Mr. and Mrs. Bengston resided in the city of Colville. Their dispute and the events which followed occurred within the city of Colville. County Deputy Sandra Van Skyock,[1] a dispatcher, informed City Officer Terry Bowers

---

[1]For reference, we list the peace officers involved in the Bengston operation by agency:

| City of Colville Police Department | Stevens County Sheriff's Department |
|---|---|
| Police Chief Robert Cole | Inspector Kenneth Meyer |
| Captain Damond Meshishnek | Deputy Craig Thayer |
| Detective Sgt. Gilbert Geer | Deputy Ed Harris |
| Detective Ed Richart | Deputy Ken Allen |
| Officer Terry Easling | Deputy Sandra Van Skyock |
| Officer Terry Bowers | |
| Officer Brynolf L. Johnson | |

Mr. Bengston was in the Bengston home, had access to weapons and refused to release his children. Officer Bowers responded to the Carpenter home. City Detective Sergeant Gilbert Geer arrived within a few minutes, as did County Deputy Craig Thayer. Deputy Thayer overheard the radio transmission and went to assist city officers.

As the ranking city officer, Sergeant Geer assumed control of the operation. City Police Chief Robert Cole arrived and assumed overall command of the operation. County Inspector Kenneth Meyer accompanied Chief Cole to the scene at Chief Cole's request. Together they set up an observation point. City Police Detective Ed Richart relieved Inspector Meyer and Inspector Meyer returned to his office.

Sergeant Geer assumed responsibility for negotiations with Mr. Bengston, activity in the Carpenter residence (located next to the Bengston residence), and activity in the Bengston yard. City Police Captain Damond Meshishnek assumed command at the radio communications center located in the sheriff's office.

For the next 2 hours, Sergeant Geer negotiated with Mr. Bengston, talked to Mr. Bengston's mother and requested a mental health professional be sent to the Carpenter residence. When negotiations began to break down, Sergeant Geer told Captain Meshishnek the situation was deteriorating. Captain Meshishnek ordered Sergeant Geer to evacuate civilians from the Carpenter residence. While Sergeant Geer was carrying out those orders, County Deputy Ed Harris, a hostage negotiator, arrived at the Carpenter residence. Shortly after Deputy Harris' arrival, Mr. Bengston left his residence and began shooting at the family dog and the Carpenter house. Chief Cole ordered Captain Meshishnek to block off the streets. Deputy Thayer requested assistance from Deputy Ken Allen because of Deputy Allen's expertise as a sniper. When Deputy Allen arrived, Sergeant Geer briefed him and directed him on how to proceed. Before Deputy Allen was able to take up a position, Mr. Bengston shot and killed Mr. Sheimo, who happened to be driving by the Bengston residence. Once in position, Deputy Allen fired

a single shot at Mr. Bengston, disabling him. The action by Mr. Sheimo's survivors against the City followed, as did this third party action by the City against the County.

## ISSUES

We find two issues dispositive.

Does the County avoid liability because its officers were under the "direction and control" of the City as provided by the Act (RCW 10.93.040)?

Is there a genuine issue of material fact which precludes summary judgment?

## WASHINGTON MUTUAL AID PEACE OFFICER POWERS ACT

In 1985, the Legislature enacted the Washington Mutual Aid Peace Officer Powers Act of 1985, RCW 10.93. The intent of this legislation was to modify the geographic restrictions which had limited the authority of Washington peace officers to act beyond their territorial jurisdictions and to effectuate mutual aid among local, state and federal agencies. RCW 10.93.001(2), (3). The Act expanded the authority of law enforcement officers to act throughout the state in a variety of circumstances including:

> (2) In response to an emergency involving an immediate threat to human life or property;
> (3) In response to a request for assistance pursuant to a mutual law enforcement assistance agreement with the agency of primary territorial jurisdiction or in response to the request of a peace officer with enforcement authority;

RCW 10.93.070. The City does not dispute that county deputies had the authority to respond to an emergency involving an immediate threat to human life. The question the City raises is whether both the City and County, or the City alone, are liable for the conduct of the County's deputies during the emergency operation.

We hold RCW 10.93.040 is controlling:

> Any liability or claim of liability which arises out of the exercise or alleged exercise of authority by an officer acting within the course and scope of the officer's duties as a peace officer under this chapter is the responsibility of the primary

> commissioning agency *unless* the officer acts under the direction and control of another agency or unless the liability is otherwise allocated under a written agreement between the primary commissioning agency and another agency.

(Italics ours.) The agency with primary *territorial* jurisdiction is the agency with responsibility for police activity within its boundaries. RCW 10.93.020(7). Here, this responsibility lies with the City of Colville. The primary *commissioning* agency is the employing agency. RCW 10.93.020(8). The primary commissioning agency for Stevens County deputies is the county sheriff's department.

▪ The language of RCW 10.93.040 is clear. It shifts liability for a peace officer's negligence from the officer's primary commissioning agency under two circumstances: (1) if the officer acts under the direction and control of another agency, or (2) there is a written agreement between the two agencies which allocates liability. The County argues (1) controls allocation of liability because its deputies were acting under the City's direction and control. We agree.

The City argues there must be a specific agreement between agencies before liability shifts. It relies on RCW 10.93.050:

> All persons exercising peace officer powers under this chapter are subject to supervisory control of and limitations imposed by the primary commissioning agency, but the primary commissioning agency may, by agreement with another agency, temporarily delegate supervision over the peace officer to another agency.

RCW 10.93.050 permits one agency to delegate supervisory authority over its officers to another by agreement. When read in context, it is not the only method by which an agency delegates supervisory authority. Statutes should be construed to give effect to their purpose. *State v. Richardson*, 81 Wn.2d 111, 117, 499 P.2d 1264 (1972). Provisions of the same act should be harmonized to the extent possible. *State v. Neher*, 112 Wn.2d 347, 352, 771 P.2d 330 (1989). To hold that liability can only be shifted by an agreement delegating supervision renders superfluous language in RCW 10.93.040. RCW 10.93.040 shifts liability from the primary

commissioning agency to a second agency when those peace officers act under the second agency's direction and control.

The City cites *Lynnwood v. $128 Cash*, 61 Wn. App. 505, 810 P.2d 1377 (1991) as support for its position. It is distinguishable. In *Lynnwood*, city police seized property in an unincorporated area of the county under a written grant of authority by the county sheriff. Owners of the seized property argued that only the County had authority to bring an action to forfeit the property because city police were exercising power on behalf of the County. The court concluded the county sheriff's written consent to extend seizure authority to city police did not subject Lynnwood officers to the County's supervisory control. The court in *Lynnwood* also found no evidence the Lynnwood police department delegated supervisory control of its officers to the county sheriff. *Lynnwood*, at 511-12.

The City's argument that an agreement is required before liability shifts ignores reality. Police are commonly faced with emergency situations not covered by agreements. The Act recognizes the necessity for peace officers to respond to these emergencies (RCW 10.93.070(2)) or to respond to another officer's request for assistance (RCW 10.93.070(3)). The situations and events anticipated by these provisions of the Act do not permit lengthy negotiations between police agencies over who is in charge or how best to proceed. They are paramilitary operations requiring a chain of command. RCW 10.93.040 allocates liability in those circumstances. The Act is to be liberally construed. RCW 10.93.001(3). The purpose of the Act is furthered by application of RCW 10.93.040.

▮ The City argues that traditional common law concepts governing the rights and obligations of "loaned servant" or "borrowed servant" should apply. *See American Sign & Indicator Corp. v. State*, 93 Wn.2d 427, 610 P.2d 353 (1980); Restatement (Second) of Agency § 227 (1958). Because the Act clearly applies to the relationship between law enforcement agencies under the circumstances of this case, we reject the City's loaned servant theory.

## PUBLIC POLICY CONSIDERATIONS

Our decision to apply the Act as we do furthers important public policy considerations. The rule of nonliability under RCW 10.93.040 for an agency which surrenders an officer to the direction and control of another agency is equitable. It also furthers effective law enforcement by fostering cooperation and subordination of authority where appropriate. If an agency remains answerable for damages for the conduct of its officers while they are under another agency's direction and control, the policy of mutual aid is undermined. A lending agency may well be reluctant to respond to a request for assistance for fear of liability for acts over which it has no control. Moreover, interagency squabbles over authority or concerns of potential liability might even prove dangerous to the public or the officers involved in a hostage taking or other life threatening situation. The essential requirement for a single, reliable chain of command would be compromised. Given the specter of liability for command decisions over which it has no control, the lending agency would resist subordinating its officers to the direction and control of the assisted agency. Our interpretation of the Act is consistent with its purpose to promote effective law enforcement and foster mutual aid among law enforcement agencies.

## SUMMARY JUDGMENT

The City next contends genuine issues of material fact exist as to whether the County was acting under the City's direction and control. We disagree.

██ On summary judgment, the moving party bears the initial burden of showing the absence of a material issue of fact. *Howell v. Spokane & Inland Empire Blood Bank*, 117 Wn.2d 619, 624, 818 P.2d 1056 (1991). The nonmoving party must set forth specific facts showing there is a genuine issue for trial. CR 56(e); *Young v. Key Pharmaceuticals, Inc.*, 112 Wn.2d 216, 225-26, 770 P.2d 182 (1989). In determining whether summary judgment is proper, a reviewing court considers the evidence and all reasonable inferences in a light most favorable to the nonmoving party. *Young*, at 226.

Viewing the evidence in a light most favorable to the City, the record overwhelmingly reflects the county deputies were under the direction and control of the City during the entire operation. We reviewed those facts which the City contends raise genuine issues of material fact and find they are not sufficient to defeat the County's motion for summary judgment. *Meyer v. UW*, 105 Wn.2d 847, 852, 719 P.2d 98 (1986). We conclude the County was entitled to summary judgment.

Affirmed.

SHIELDS, C.J., and MUNSON, J., concur.